## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

FRANCINE EVANS,               )
                                           )
                   Plaintiff,     )
                                           )
               v.              )     Case No. 1:20-cv-0030
                                           )
UNITED STATES OF AMERICA and/or   )
DEPARTMENT OF THE               )
INTERIOR/NATIONAL PARK SERVICE OF   )
THE UNITED STATES OF AMERICA,    )
                                           )
                 Defendant.   )
                                           )

ATTORNEYS:

ANNA M. WASHBURN, ESQ.
St. Croix, USVI
     *For Plaintiff,*

ANGELA P. TYSON-FLOYD, ESQ.
Office of the United States Attorney
St. Croix, USVI
     *For Defendant.*

## <u>MEMORANDUM OPINION</u>

**MOLLOY, Chief Judge.**

    **BEFORE THE COURT** is Defendant United States of America's ("the Government") Motion to Dismiss for Lack of Jurisdiction, or in the Alternative, for Failure to State a Claim for Which Relief May Be Granted.[1] (ECF No. 8.) Plaintiff opposed the motion. (ECF Nos 12, 13.) The Government filed a reply. (ECF No. 14.) For the reasons that follow, the Court will deny the motion.

### I. BACKGROUND

    Plaintiff commenced this action pursuant to the Federal Tort Claims Act ("FTCA"), 28

---

[1] Although the Government's motion is styled, in the alternative, as a motion for failure to state a claim, the Government's memorandum of law was submitted only "in support of its Motion to Dismiss for lack of subject matter jurisdiction" (ECF No. 9 at 1) and contains no arguments based on Rule 12(b)(6) of the Federal Rules of Civil Procedure.

U.S.C. §§ 2671-2680, alleging that on April 4, 2017, in the public restroom located in the Danish West Indica & Guinea Company Warehouse ("DWI&GCW") of the Fort Christiansted National Historical Site ("CNHS") in Christiansted, St. Croix. Plaintiff was assisting preschool boys that she was chaperoning on a field trip when she tripped on two steps, fell, and suffered serious injuries. (Compl. ¶ 5, ECF No. 1.) According to Plaintiff, when a person walks into the restroom, it is necessary to turn a corner and be met immediately with a set of steps which were not uniform and even, and the handrailing on the wall is not easily reachable before accessing the steps. (*Id.* at ¶ 6.) Plaintiff asserts that her injuries were caused by the defective and negligent design and construction of the restroom facility, failure to warn of the dangerous condition, and inadequate lighting. (*Id.* at ¶¶ 6-8.)

The Government filed the instant motion seeking to dismiss the complaint for lack of subject-matter jurisdiction.

## II. LEGAL STANDARD

A party may assert a lack of subject-matter jurisdiction by a motion. Fed. R. Civ. P. 12(c)(1). A Rule 12(b)(1) motion may be used to raise either a facial or factual challenge to the court's subject-matter jurisdiction. *See Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff. In reviewing a factual attack, the court may consider evidence outside the pleadings." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

Although "there is no express provision [in the United States Constitution] that the United States may not be sued in the absence of consent," suits against the United States are barred "by reason of the established doctrine of the immunity of the sovereign from suit except upon consent." *Principality of Monaco v. State of Mississippi*, 292 U.S. 313, 321 (1934). "In 1946, Congress passed the FTCA, which waived the sovereign immunity of the United States for certain torts committed by federal employees" acting within the scope of their employment. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). The FTCA provides that the United States may be sued for money damages "for injury or loss of property, or personal injury or

death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C.A. § 1346 (b)(1). The FTCA also provides an exception to Section 1346 (b)(1) for:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C.A. § 2680 (a).

In *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, (3d Cir. 2012), the Third Circuit Court of Appeals succinctly stated the standard that a district court must apply when considering the discretionary function exception:

> As a threshold matter, before determining whether the discretionary function exception applies, a court must identify the conduct at issue. The court must then follow a two-step inquiry to determine whether the discretionary function exception immunizes the government from a suit arising out of such conduct. First, a court must determine whether the act giving rise to the alleged injury and thus the suit involve[d] an element of judgment or choice. If a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, the exception does not apply because the employee has no rightful option but to adhere to the directive. However, where a specific course of action is not prescribed, we proceed to the second step, which requires us to determine whether the challenged action or inaction is of the kind that the discretionary function exception was designed to shield. Because the purpose of the exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy . . . the exception protects only governmental actions and decisions based on considerations of public policy. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis. Although a plaintiff bears the burden of establishing that his claims fall within the scope of the FTCA's waiver of the federal government's sovereign immunity (i.e., that the requirements of 28 U.S.C. § 1346(b)(1) are met), the Government has the burden of proving the applicability of the discretionary function exception.

*Id. at* 332–33 (internal citations and quotations omitted).

### III. DISCUSSION

The Government raises a factual challenge to subject-matter jurisdiction, arguing that decisions regarding design of the public restrooms and installation of fixtures and not to post signs to warn of the steps in the public restroom are protected by the discretionary function exception ("DFE") to Section 1346 (b)(1). The Government asserts that the relevant conduct is the design of the public restroom at CNHS, including the installation and design of the steps, placement of a handrail and type of lighting installed in the restroom facility. According to the Government, there are no laws, regulations, or policies prescribing a specific course of action that National Park Service ("NPS") officials had to follow in the design and renovation of the restroom facility in CNHS. Rather, it was within the discretion of the Superintendent and other decision makers to decide what design to implement, taking into consideration the continued overflow of storm water and sewage into the restroom facilities, the need to preserve the historic nature of the building, and the need for public restrooms. The Government contends that the overflow of the storm water and sewage when the restroom was at ground level made it necessary to elevate the plumbing and add at least two steps. As no new restroom could be built in CNHS, the continued flooding posed a threat to the entire building structure, and the sewage presented health and safety risk. The elevated design had the least impact on the historic structure because it allowed for preservation of the historic appearance of the structure, leaving undisturbed the archeological and historic foundation. Moreover, the elevated design allowed for use of pre-existing walls that retained the historic appearance of the structure. The use of sky lights and recessed light near the entrance of the restroom also served to preserve the historic appearance of the structure. Since these are the types of policy judgments that the DFE protects, Plaintiff's claims are barred. In support of the motion, the Government submitted a declaration with exhibits by Reginald M. Tiller ("Tiller"), Acting Superintendent of the CNHS.

Plaintiff contends that the Government admits that the two steps were designed not to extend beyond a pre-existing wall that serves as the entrance into the public restroom and the first step nearest the ground level is wider on one side because of the need to keep it within in the pre-existing side wall that serves as the entrance. The handrail for the two steps

was mounted on the right wall upon the entrance to the restroom and was not visible until a person already made a U-turn to the restroom. The handrail did not extend to the end of the wall where the steps began but was located beginning at the level of the second step. The lighting was very dim and a person entering a building from the bright Caribbean daylight could easily have difficulty adjusting to the difference. Although skylights were added to the Hospital Street entrance, Tiller did not mention that there was any lighting in the back corner of the building where the entrance to the restroom was located. Plaintiff argues that Tiller's declaration is not reliable to establish that the DFE applies because it is not based on personal knowledge or personal viewing of the restroom, it is vague and confusing in several aspects, it references hearsay and contains untrue statements. For example, Tiller incorrectly asserts that the "first step is narrow where it meets an existing side wall that serves as the entrance to the restroom facilities, but widens to normal width on the side where the handrail was installed" and that the handrail is on the left-side of the step, which even cursory view of the steps shows that the narrow or right-hand side of the steps is the side with the handrail, not the left. Even if Tiller's perspective was from the top of the steps, the handrail is still on the narrow side of the steps. Tiller' statement that the decisions related to the design, construction, remodeling, and elevation of the subject restroom were made by NPS is contradicted by his statement that CNHS was controlled by the U.S. Department of Treasury and later managed by the General Services Administration ("GSA") and used as a Post Office, and it was only in 2001 that GSA sold DWI&GCW to the NPS. Similarly confusing is the Government's assertion that the restroom facilities within the DWI&GCW were established before the NPS obtained management responsibilities and ownership of the structure and the Superintendent could exercise professional judgment to determine if the continued use of the structure as a restroom facility was an unacceptable impact to the CNHS. Tiller also states that the NPS, in consultation with the Government of the Virgin Islands and the Virgin Islands Historic Preservation Committee, decided to elevate the plumbing above ground level, and that the Government of the Virgin Islands was responsible for maintenance prior to 1988. According to Plaintiff, it is not clear which entity made the expansion and elevation decision in 1988 and what was the source of the NPS's authority concerning the

building. Plaintiff asserts that it is hard to imagine that there were no specific mandates related to the renovation and that the entire project was controlled by the discretion of a Superintendent. Although Tiller states that he reviewed certain historic documents and information, he failed to identify or produce them. Without that evidence, it cannot be confirmed that discretion was used in designing the plan and the construction was performed according to the plan. Tiller asserts that he consulted with the current and former NPS employees, without identifying them or the specific details of their conversations. Plaintiff argues that, even assuming that no federal mandates governed the NPS's actions and that the NPS's actions were discretionary, they are not covered by the DFE. The conduct at issue is the defective condition of the restroom entrance due to its design. However, the actions in this case do not involve decisions "susceptible to policy analysis" that the DFE protects. Plaintiff asserts that there was no preservation of any character or integrity of anything historical. For example, no distinctive materials or features were retained other than the outside shell of the building. the entire spatial relationship was altered, the floors on the building are a square, gray tile, and are not historic, the walls leading into the bathroom and the bathroom walls are tiled with small, neutral-colored tiles that are not historic and the walls that are not tiled are dingy. The Government failed to demonstrate how a sign warning about the imminent encounter with unseen and dangerous steps is grounded in policy decisions. In support of the opposition, Plaintiff submitted photographs of the restroom entrance at issue.

In reply, the Government asserts that Tiller does not need personal knowledge of the relevant decisions made long time ago because he is familiar with the NPS's management of CNHS and has access to business records pertaining to CNHS, which makes him fully competent to declare whether any mandatory federal statutes, regulations or policies existed prescribing a specific course of action. Moreover, Tiller's declaration makes it clear that in 1988, regardless of who owned or managed the DWI&GCW, the NPS undertook the project to plan, design and renovate the public restrooms. Plaintiff 's speculation that there was no mandate relative to the restroom renovation is insufficient to dispute the first prong of the DFE analysis. As to the second prong of the DFE analysis, the Government contends that the

1988 decisions to elevate the floor of the restroom facility to remediate the health and safety concerns caused by storm water and sewage overflow into the restroom was a means to preserve the DWI&GCW's historic foundation and to maintain the historic appearance by not destroying existing walls and constructing new walls. The policy not to negatively impact the historic appearance of the structure influenced decisions regarding the type of lighting and lack of sign warning. Those decisions are susceptible to a policy driven analysis. In support of the reply, the Government submitted an excerpt from NPS 1988 Management Policies.

### 1. *Conduct at Issue*

Parties do not dispute, and the Court finds that the relevant conduct is the design of the public restroom located in at the CNHS and its implementation, including uneven steps, placement of a handrail, type of lighting installed inside the restroom and the lack of warning signage.

### 2. *Whether the Act Giving Rise to the Alleged Injury Involved an Element of Judgment or Choice*

Tiller's declaration accompanied by exhibits (Tiller Decl., ECF No. 9-1 to ECF 9-8) is the only evidence submitted by the Government in support of its argument that the DFE exemption to Section 1346 (b)(1) applies in this case. In his declaration Tiller referenced Exhibits A, B, C, D, E,[2] F and G.

In describing CNHS's history, Tiller cited the 1952 order of the Secretary of the U.S. Department of Interior establishing the Virgin Islands National Historic Site (Exhibit A) and the 1960 redesignation as the Christiansted National Historic Site (Exhibit B). (Tiller Decl.¶ 4.) Tiller stated that NPS manages CNHS pursuant to the National Park Service Organic Act, 54 U.S.C. § 100101, and that the CNHS management is governed by a myriad of federal statutes, executive orders, regulations, NSP-Policy-level Guidance, including the NPS 2006 Management Policies, Director's Orders, and the Secretary of the Interior's Standards for treatment of Historic Properties 1995. (*Id.* at ¶ 6.) Tiller cited certain sections from the NPS

---

[2] Tiller describes Exhibit E as "MOA dated Feb. 22, 1972." (ECF No. 9-1 ¶ 11.) Attached to his declaration are two exhibits marked "G" identified as "February 22, 1972 Memorandum of Agreement" and "Excerpt of NPS 1986 General Management Plan for CNHS." It appears that "February 22, 1972 Memorandum of Agreement" is erroneously marked as Exhibit G. The Court will deem "February 22, 1972 Memorandum of Agreement" Exhibit E as that appears consistent with Tiller's reference to it in his declaration.

2006 Management Policies (Exhibit C), stating they prohibit impairments or impacts on historic resources and allow appropriate uses not mandated by legislation or proclamation establishing CNHS, and provide for construction of new structures and utilities in certain circumstances, as well as visitor safety and the posting of signs. (*Id.* at ¶¶ 7-10.) Additionally, the Secretary of the Interior's Standards for Treatment of Historic Properties 1995 (Exhibit D) also provide standards for preservation. (*Id.* at ¶ 9.) According to Tiller, NPS and the Government of the Virgin Islands entered into a series of Memoranda and Agreement between 1972 and 1985 that outlined and broadened NPS's role and responsibilities, citing "MOA dated Feb. 22, 1972" (Exhibit E), "June 27, 1985 Addendum No. 3 to MOA (Exhibit F), and "Excerpt of NPS 1986 General Management Plan" (Exhibit G), with the goal of restoring the structures and landscaping within CNHS as close as possible to their historic appearance during the Danish Colonial Era. (*Id.* at ¶ 11.) Tiller stated that, since 1982, the only public restrooms are located at CNHS in one of the three structures that comprise DWI&GCW. (*Id.* at ¶ 13.)

Tiller explained that DWI&GCW "was controlled by the U.S. Department of Treasury and later managed by the General Services Administration (GSA)," but in 2001, GSA sold DWI&GCW to the NPS. (*Id.* at ¶ 17.) According to Tiller, due to CNHS's location directly on the Christiansted wharf and "outdated drainage and sewage systems/infrastructure in Christiansted, all storm water run-off and drainage from Christiansted and the surrounding hills flow through CNHS and into the harbor, which presented a significant challenge to NPS in preserving the foundation and structural stability of the historic buildings. (*Id.* at ¶ 19.) During heavy rainfall, storm water and sewage would overflow into the public restrooms at DWI&GCW causing damage and deterioration of the structure, its foundation, and fixtures. (*Id.*) Due to increased visitor demand and continued storm water and sewage overflow into the public restrooms, it became necessary to remodel the restrooms, which required planning and the weighing of various policy considerations, such as the historic nature of DWI&GCW, the fact that new restrooms could not be built in CNHS, the fact that public restrooms were necessary for the enjoyment of the CMHS visitors, and the cost to remediate the sewage overflow into the restrooms without disturbing the historic appearance. (*Id.* at ¶

20.)

According to Tiller, NPS, "in consultation with the Government of the Virgin Islands' Department of Planning and Natural Resources and the V.I. Historic Preservation Committee, made a decision to elevate the plumbing in the public restrooms above ground level." (*Id.* at ¶ 21.) The purposes of the elevation were to allow "for expansion and remodeling of the public restrooms without disturbing the original and archeological foundation of the historic structure below grade" and to minimize "flooding, storm water and sewage overflow events within the restrooms during periods of heavy rainfall." (*Id.*) Tiller explains:

> In 1988, the NPS began construction to expand the public restrooms and elevate the plumbing. To elevate the plumbing, it was necessary to include in the design, two steps to enter the restrooms. The two steps were designed not to extend beyond an existing side wall that is part of the Hospital Street entrance into the public restrooms. Design decisions also were made not to disturb existing walls within the historic structure, and to limit the construction of new walls, pursuant to NPS policy and guidance for new construction within historic structures. The first step is narrow where it meets an existing side wall that serves as the entrance to the restroom facilities, but widens to normal width on the side where the handrail was installed. In 1991, when construction was completed on the public restrooms, the new design included three skylights in the roof that allowed natural light to flow into the Hospital Street entrance of the restrooms. There were also two recessed lighting fixtures at the entrance to the restroom facilities. NPS installed a toilet and sink basin on the ground level that is accessible for persons with wheelchairs or other ambulatory disabilities who may be unable to navigate the two steps. Additionally, the NPS ensured that the design of the public restrooms complied with all regulations established by the Occupational Safety and Health Administration (OSHA). Because there are only two steps to navigate, OSHA does not require handrails. NPS nevertheless, installed a handrail on the left side of the step, which was present on April 4, 2017 when Plaintiff allegedly tripped and fell on the steps.

(*Id.* at ¶¶ 22-23.)

Tiller's statement, without citation to any source, that "[t]he first step is narrow where it meets an existing side wall that serves as the entrance to the restroom facilities, but widens to normal width on the side where the handrail was installed" (*id.* at ¶ 22) is controverted by the Plaintiff's photographs showing that the handrail is installed on the wall where the narrow side of the first step ends. (ECF Nos. 13-1, 13-2.) Plaintiff is correct that

Tiller's statements describing the restroom at issue are confusing as he did not indicate the observation reference point from which the objects are located on the left or the right and he did not cite to any sources for his information. This statement, without citation to any source, that NPS "installed a handrail on the left side of the step" (*id.* at 23) is ambiguous and, in light of the erroneous statement controverted by the Plaintiff's photographs, also appears to be erroneous. These errors beg the question about the sources Tiller used to describe the restroom at issue suggesting they are inaccurate, and Tiller did not state that he visited the restroom at issue or that he reviewed any photographs.

Although Tiller states that CNHS was "later managed" by GSA, citing Exhibits B and F (*Id.* at ¶ 17), he does not identify any point in time to qualify the word "later." Exhibit B, which is the 1960 Memorandum of Agreement between NPS and the Office of Territories, states that "Cable Office Building or Post Office" is controlled by the Treasury Department and "maintained" by GSA. (ECF No. 9-3 at 3.) Exhibit F, which is the 1985 Addendum Number Three to Memorandum of Agreement, states that NPS "will assume management and maintenance responsibilities of all structures and lands within the boundary, with exception of the Danish West India and Guinea Co. warehouse which is under the management of the [GSA] for use as a Post Office." (ECF No. 9-7 at 4.) Exhibit E, which is the 1972 Memorandum of Agreement between the Government of the Virgin Islands and NPS, states that control of "Old Cable Office (West India & Guinea Co. Warehouse)" is in the U.S. Department of Treasury and, under "Article II. Relinquishment of Control," with respect to "Old Cable Office (West India & Guinea Company Warehouse)": "Should the use of this historic building as a Post Office terminate, the Government of the Virgin Islands agrees to seek transfer of control to the National Park Service for management as a historic structure." (ECF No. 9-6 at 3.) Together, Exhibits B, E and F demonstrate that the structure referred to in the pertinent memoranda of agreement as "Cable Office Building or Post Office," "Danish West India and Guinea Co. warehouse," and "Old Cable Office (West India & Guinea Company Warehouse)" was controlled by the U.S. Department of Treasury in 1960 and 1972, "maintained" by GSA in 1960, not managed by NPS in 1972, and managed by GSA in 1985.

There is no evidence establishing when NPS "made a decision to elevate the plumbing

in the public restrooms above ground level" (Tiller Decl. ¶ 21.), who managed CNHS, including DWI&GCW, at the time of decision making and what was the source of authority to make decisions regarding the conduct at issue. Tiller asserts, without any corroborating evidence, that NPS made a decision "in consultation with the Government of the Virgin Islands' Department of Planning and Natural Resources, and the V.I. Historic Preservation Committee" (*Id.*), which, if true, undermines the argument that the decision-making in connection with the conduct at issue was discretionary. There is also no evidence of who managed CNHS, including DWI&GCW, in 1988, when Tiller asserts "the NPS began construction to expand the public restrooms and elevate the plumbing." (Tiller Decl. at ¶ 22.) The design of the restroom must have occurred prior to the beginning of construction in 1988, but Tiller's declaration is silent about the time the relevant decision making concerning the restroom design occurred.

Exhibit G, the 1986 General Management Plan/Environmental Assessment, which is incomplete and contains only pages I, ii, vi, 1, 3, 7, 8, 9, 12 and 14, indicates that GSA maintains the building for the use of the local Post Office. (ECF No. 9-8 at 7.) There is no evidence when, if at all, the use of DWI&GCW as a Post Office terminated, and whether "transfer of control to the National Park Service for management as a historic structure" occurred as contemplated by the 1972 Memorandum of Agreement. (ECF No. 9-6 at 3.) Exhibit G indicates that "[a] series of Memoranda and Agreement (1952, 1960, 1972, 1976, 1977 and 1985) outline the relationship at the historic site between the Virgin Islands Government and the NPS. No single one of these agreements stands alone in defining the roles and responsibilities of the two government entities." (ECF No. 9-8 at 8.) Tiller did not submit Memoranda and Agreement dated 1976, 1977 and 1985, or "a new Memorandum and Agreement [that] will be prepared that will include all pertinent elements of the previous memoranda, appropriate elements of this GMP, and any other elements necessary to reflect the current needs of the Government of the Virgin Islands and the NPS." (*Id.* at 11.) Tiller also did not submit "The Maintenance Agreement between the National Park Service and Government of the Virgin Islands signed on March 4, 1980." (ECF No. 9-7 at 6.)

Exhibit G, the 1986 General Management Plan/Environmental Assessment, states

that the purpose of the plan "is to give guidance to the management of [CNHS] over the next 10 or more years" and provides proposals that "have been developed to resolve issues that are seen as impediments to achieving the historic site's management objectives (Management Objectives are located in Appendix B)." (ECF No. 9-8 at 8.) Although Tiller did not submit Appendix B, Exhibit G indicates under "Operational Considerations":

> Public rest rooms are located within the fort. These are not accessible to the handicapped and have steep, uneven steps that are difficult for some to negotiate. Fully accessible public rest rooms are available across Hospital Street at the Danish West India and Guinea Company Warehouse (Post Office). These facilities are not large enough to hand the large influx of persons arriving by tour buses from Fredriksted [sic] and are not always open during times of heavy visitation to the downtown/waterfront area and historic site.

(ECF No. 9-8 at 10.) No mention is made in the 1986 General Management Plan/Environmental Assessment, including under "Major Issues," of the grounds for the design at issue that Tiller indicated, namely, outdated drainage and sewage infrastructure, or that "all storm water run-off and drainage from Christiansted and the surrounding hills flow through [CNHS] and into the harbor," or that "during heavy rainfall storm water and sewage would infiltrate and overflow into the public restrooms at DWI&GCW causing damage and deterioration of the structure, its foundation, and fixtures." (Tiller Decl. at ¶ 19.) If Tiller's assertions are true, including that "[d]ue to increased visitor demand and continued storm water and sewage overflow into the public restrooms it became necessary to remodel the restroom facilities," (Tiller Decl. at § 20), it could be expected that the 1986 General Management Plan/Environmental Assessment would mention "continued storm water and sewage overflow into the public restrooms" causing damage under "Major Issues" (ECF No. 9-8 at 3) or include a proposed action to remedy such issue (*Id.* at 3-4). However, the only major issue identified in the 1986 General Management Plan/Environmental Assessment is that CNHS is "used for parking by people working, shopping and congregating in the downtown area." (*Id.* at 3). "Other issues addressed by" the 1986 General Management Plan/Environmental Assessment, (*id.* at 3), appear to be identified under "Operational Considerations," including that the restroom facilities "are not large enough to handle the large influx of persons" and "are not always open during times of heavy visitation." (*Id.* at 3).

The only specific proposal in connection with the issues identified related to the restrooms located in DWI&GCW is that a new Memorandum of Agreement will ensure increased hours when they will be open to visitors. (*Id.* at 12). However, no proposal was made to expand or remodel the restrooms due to increased visitor demand and continued storm water and sewage overflow into the public restrooms. Tiller did not identify any part of any exhibit he submitted that would support his assertion that "[d]ue to increased visitor demand and continued storm water and sewage overflow into the public restrooms it became necessary to remodel the restroom facilities." (Tiller Decl. at § 20.)

Exhibit G, the 1986 General Management Plan/Environmental Assessment, also provides:

> National Historic Preservation Act of 1966
> Compliance with Section 106 of the National Historic Preservation Act is required. Compliance with Section 106 requires the NPS to allow the Advisory Council on Historic Preservation and the Government of the Virgin Islands State Historic Preservation Officer to comment on the plan's effect on significant cultural resources in accordance with the Council's regulations, 36 CFR 800. Pursuant to those regulations, the Advisory Council, the NPS, and the National Conference of State historic Preservation Officers have executed a Programmatic Memorandum of Agreement on the NPS planning process. In accordance with that 1979 Memorandum of Agreement and the 1981 Amendment, the Council and the Government of the Virgin Islands State Historic Preservation Officer all participated in the development of this plan through consultation and reviews. These consultations and reviews will continue throughout the planning process, and both parties will be given an opportunity to formally review and comment on the proposed plan before it is approved by the NPS Regional Director. Evidence of compliance with section 106, as applicable to this plan, will be included in its final National Environmental Policy Act document.

The above language indicates clearly that compliance with Section 106 of the National Historic Preservation Act was required. Tiller did not submit the "Programmatic Memorandum of Agreement on the NPS planning process" or the "1979 Memorandum of Agreement and the 1981 Amendment," which may have shed light on the NPS's roles and responsibilities in the decision-making process relevant to the conduct at issue. The fact that compliance with the National Historic Preservation Act was required in 1986 mandating consultation with and participation of other non-NPS entities undermines the Government's

argument that NPS was not bound to follow a prescribed course of action in connection with the conduct at issue.

Tiller did not explain the relevancy of Exhibit C, Management Policies 2006 The Guide to Managing the National Park System, which he quoted in his declaration, to the conduct at issue, in light of Tiller's statement that "[i]n 1988, the NPS began construction to expand the public restrooms and elevate the plumbing" and "[i]n 1991, . . . construction was completed on the public restrooms." (Tiller Decl. at §§ 22-23.) Moreover, Exhibit C indicates that "[t]his volume of NPS Management Policies is the basic Service-wide policy document if the National Park Service, superseding the 2001 edition." (ECF No. 9-4 at 6.) This makes it even more puzzling why Tiller decided to rely on the 2006 Management Policies knowing that it superseded the 2001 edition and, by extension, any edition prior to 2001 that may have been in effect at the time of the conduct at issue. Tiller also did not show that CNHS is part of the National Park System or that the National Park System policies apply to CNHS. Exhibit C also does not mention national historic sites or CNHS.

In its reply brief, the Government submitted Exhibit H, Management Policies U.S. Department of the Interior National Park Service 1988, (ECF No. 14-1), asserting that "[r]ecently, the United States found the 1988 NPS Management Policies" and they "contain similar policies as those contained in the 2006 Management Policies, including those for the preservation of historic structures and to cause the least negative impact on these structures during renovation or new construction." (ECF No. 14 at 6.) However, the Government failed to submit an affidavit from anyone with personal knowledge explaining Exhibit H and supporting the factual assertions in the Government's brief, which are not evidence. *Bell v. United Princeton Properties, Inc.*, 884 F.2d 713, 720 (3d Cir. 1989) ("statements made in briefs are not evidence of the facts asserted).

The Government's argument that "there was no prescribed course of action that CNHS officials had to follow in 1988 when it undertook the project to design and renovate the public restroom facilities at the CNHS" is unsupported by evidence. Tiller did not state when NPS, in consultation with other entities, decided to elevate the plumbing in the public restrooms above the ground level, he only indicated that NPS began construction in 1988

*Evans v. National Park Service*
Case No. 1:20-cv-0030
Memorandum Opinion
Page **15** of **15**

and completed it in 1991. No evidence exists establishing when the public restroom in DWI&GCW, as it was at the time of the alleged injury, was designed or what policies were in effect at the time of its design.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the Government failed to satisfy its burden that the discretionary function exception applies in this case. Accordingly, the Court will deny the motion to dismiss. An appropriate order follows.


**Dated:** March 14, 2023                                 */s/ Robert A. Molloy*
                                                          **ROBERT A. MOLLOY**
                                                          **Chief Judge**